UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **M. M.**, | Case No. 18-cv-05396-YGR |
| Plaintiff, | |
| v. | **ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, (2) DENYING PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, AND (3) DENYING AS MOOT DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY OF ROGER CLARK UNDER FED. R. EVID. 702** |
| **COUNTY OF SAN MATEO, ET. AL.**, | |
| Defendants. | |
| | Re: Dkt. Nos. 51, 53, 59 |

Plaintiff M.M., a minor, by and through her Guardian *ad litem*, brings this action against defendants County of San Mateo (the "County"), deputies Robert Willett, Devin Crocker, James Brown, and Does 1 to 50, inclusive. Plaintiff alleges four causes of action: (1) deprivation of constitutional rights in violation of 42 U.S.C. Section 1983, including unreasonable search and seizure, arrest without probable cause, and excessive and unreasonable force and restraint in the course of an arrest against deputies Willet, Crocker, and Brown, as well as Does 1-25; (2) deprivation of those same constitutional rights in violation of Section 1983, pursuant to *Monell*, against the County and Does 26-50; (3) violation of California Civil Code § 52.1, the Bane Act, against all defendants; and (4) battery against all defendants.

Now before the Court are the following motions: First, defendants move for summary judgment on plaintiff's claims. Second, plaintiff cross-moves for partial summary judgment on the issue of excessive force. Third, defendants move to exclude expert opinions and testimony of Roger Clark under Fed. R. Evid. 702.

Having carefully reviewed the pleadings, the papers submitted on each motion, the parties' oral arguments at the hearing held on December 10, 2019, and for the reasons set forth more fully

below, the Court: (1) **GRANTS** defendants' motion for summary judgment; (2) **DENIES** plaintiff's motion for partial summary judgment; and (3) **DENIES AS MOOT** defendants' motion to exclude expert opinions and testimony of Roger Clark under Fed. R. Evid. 702.

## I. BACKGROUND

<u>The initial facts of this incident are not materially in dispute</u>: On August 13, 2017, plaintiff was residing at Your House South ("YHS"), a group home in Redwood City. (*See* Dkt. No. 61, Undisputed Fact ("UF") 1.) Plaintiff was 15 years old, and was approximately five feet six or seven inches tall, and 120 pounds at the time of the incident. (UF 61-62.) YHS is a facility that helps at risk youth. (UF 2.) At the time, Alexis Austin was a relief counselor and facility manager at YHS. (UF 3.) Prior to August 13, 2017, plaintiff had been placed on a psychiatric hold under California Welfare & Institutions Code § 5150. (UF 4.)

On the night of August 13, 2017, after being unable to locate plaintiff, Austin reported plaintiff missing by calling 911. (UF 5.) Austin advised the 911 operator that she was "very concerned" because plaintiff was "not in a good place" and had a "history of self harm." (UF 6.) According to Austin, plaintiff had appeared to be crying and was not herself earlier that day. (UF 9.) Austin subsequently located plaintiff who had been hiding in a closet. (UF 7.) At approximately 10:51 p.m. that same day, Austin called 911 to cancel the missing person's report. (UF 8.)

Later that evening on August 13, 2017, plaintiff provided a journal entry that caused Austin concerned. (UF 10.) Plaintiff's journal entry stated, in part, that "I'm in a dark place where I can't seem to find a way out and it's slowly killing every inch of me. Just want to get out of it because soon it will be too late." (UF 11; *see also* Dkt. 51-12 at 6.) Plaintiff was concealing her arm and would not allow Austin to see her arms. (UF 12.) Austin became concerned that plaintiff may have cut herself. (UF 13.) Based on plaintiff's affect, her journal entry, and because she was holding her arms, Austin became concerned for plaintiff's welfare and safety. (UF 14.)

At approximately 12:08 a.m. on August 14, 2017, Austin called 911 to request that plaintiff be assessed for a hold under Section 5150. (UF 15.) Defendant Deputy Robert Willett responded to the dispatch call for a potential Section 5150 situation and came to YHS to assess

plaintiff for a hold. (UF 18.) Upon arrival at YHS, Dep. Willett checked to see if the San Mateo County Mental Health Assessment and Referral Team ("SMART") was available to conduct the Section 5150 assessment, but it was not. (UF 19.) Dep. Willett was relayed information from the 911 call made by Austin. (Dkt. No. 51-5 at 3-4.) Austin further provided Dep. Willett with plaintiff's journal entry. (UF 20.)

Dep. Willett entered the bedroom where plaintiff was located, introduced himself, and tried to have a conversation with her. (UF 21.) The discussion between Dep. Willett and plaintiff is disputed by the parties.[1] At some point during this discussion, Dep. Willett asked plaintiff to show her arm to him, but plaintiff refused repeated requests to do so. (UF 24.)

After several failed attempts to secure plaintiff's cooperation, and in view of the troubling journal entry that had led YHS to call for a Section 5150 assessment, plaintiff's earlier actions of hiding in a closet, refusing to show her wrists suggesting that she had harmed herself and her history of self harm, Dep. Willett determined that plaintiff should be taken to a hospital for a Section 5150 hold. (UF 25.) Dep. Willett called for an ambulance to assist with the assessment and medical evaluation of plaintiff, and to transport plaintiff to a hospital for evaluation. (UF 26.) Dep. Willett also called for backup deputies to assist. (UF 27.)

While Dep. Willett attempted to engage with plaintiff, she remained seated on a bed in her room. (UF 28.) Plaintiff continued to refuse repeated requests to show her arm. (UF 29.) At some point thereafter, paramedics and two other officers, Deputies Devin Crocker and James Brown, arrived to YHS. Plaintiff refused to show her wrists to the paramedics although plaintiff allowed her blood pressure to be taken through a device placed on her finger. (UF 30; *see also* Dkt. 54-8 at 4.) At some point thereafter, the paramedics left plaintiff's room.

Plaintiff, Austin, and Deps. Willett, Crocker, and Brown remained in plaintiff's room after

---

[1] Dep. Willett states that when he asked plaintiff about whether she had hurt herself, she did not substantively reply. (Dkt. No. 51-5 at 5-6, 12.) However, Dep. Willett also documented in the incident report that plaintiff replied "Nothing, I'm fine, you can leave." (Dkt. No. 54-2 at 59.) Deputy Willett also asserts that he asked plaintiff whether she was upset about a boy, as suggested by her journal entry, and that he wanted to make sure she was ok and get her some help, but that she did not respond. (Dkt. No. 51-5 at 5-6.)

3

the paramedics stepped out.[2] After approximately fifteen minutes of discussion between Willett and plaintiff in her room in an effort to get plaintiff to show her arms, Dep. Willett warned plaintiff that he and other deputies would be grabbing her wrist because of her non-compliance with officers' instructions and Dep. Willett's determination that plaintiff would be subject to a Section 5150 hold.[3] (UF 31; *see also* Dkt. No. 51-5 at 7, 16, 17, 18-19.) Dep. Willett told plaintiff he would count to three and that a deputy would grab each of her wrists to place her on the floor to apply handcuffs. (UF 34.) Deps. Willett and Crocker each grabbed one of plaintiff's wrist using a rear wrist control hold. (Dkt. No. 51-5 at 17; Dkt. No. 54-3 at 8-9; Dkt. No. 54-4 at 5-6.)

The parties each have different views of the next events:

Plaintiff's Version: Deps. Willett and Crocker applied a pain compliance maneuver, in other words, pressure to her wrists, prior to any resistance from plaintiff. (Dkt. No. 54-2 at 30-33, 34-35; Dkt. No. 54-3 at 6-7, 8-9; Dkt. No. 54-4 at 5-7, 8.) Based on the rear wrist control hold, plaintiff involuntarily arose from the bed where she had been seated. (Dkt. No. 54-4 at 8; Dkt. No. 63-1 at 7.) While standing, plaintiff was not stiffening, pushing back, or doing anything purposeful with her body. (Dkt. No. 54-5 at 7.) Plaintiff was subsequently slammed to the floor by Deps. Willett and Crocker while Dep. Willett had his arm around plaintiff's throat. (Dkt. No. 54-1 at 11, 13, 14-15, 16.) One of these two deputies had their knee pressed into plaintiff's back while on the floor. (Dkt. No. 54-5 at 3) Willett told plaintiff at this time, "I'm not your friend, I'm not your therapist." (Dkt. No. 54-1 at 11.) Plaintiff resisted because she could not breathe based on the pressure being applied to her back. (Dkt. No. 54-5 at 8-9, 12-13.) Dep. Brown's

---

[2] The following is undisputed: at the time of the incident, Dep. Willett was six feet tall and 220 pounds, (UF 63) and Dep. Brown was six feet tall and weighed 240 pounds; (UF 65) and, at the time of his deposition, Dep. Crocker was five feet nine inches tall and 220 pounds, but may have been, according to him, in better shape at the time of the incident. (UF 64.)

[3] Defendants claim, citing to Austin's deposition testimony, that Dep. Willett asked plaintiff to get on the floor, but that she would not do so. (Dkt. No. 51-3 at 18.) Plaintiff disputes that anyone asked her to get on the floor prior to being placed on the floor. (Dkt. No. 54-5 at 6.) Further, Austin in deposition testimony states that plaintiff told the deputies she would agree to voluntarily walk out of her bedroom and to the ambulance with the deputies. (Dkt. No. 51-3 at 18.) Plaintiff did not corroborate Austin's testimony.

4

United States District Court
Northern District of California

1    handcuffing of plaintiff resulted in abrasions to her wrists. (Dkt. No. 54-5 at 15-16.)

2         <u>Defendants' Version</u>:  Plaintiff shouted "fuck you" to Dep. Willett.  (Dkt. No. 54-2 at 8.)

3    Plaintiff arose from the bed where she had been seated.  (Dkt. No. 54-2 at 8.)  Plaintiff planted her

4    feet and stiffened her body and stated that she would not get on the floor.  (Dkt. No. 51-3 at 20;

5    Dkt. No. 54-2 at 7-8.)  Plaintiff tensed her body and went rigid.  (Dkt. No. 51-3 at 20; Dkt. No. 54-

6    2 at 8, 32, 38-39; Dkt. No. 54-3 at 9.)  At this point, Deps. Willett and Crocker applied a pain

7    compliance maneuver by applying pressure to plaintiff's wrists and back.  (Dkt. No. 54-2 at 8, 32-

8    33.)  Plaintiff resisted while on the floor. (Dkt. No. 54-2 at 34; Dkt. No. 54-5 at 8-9, 12-13.)

9         <u>The following facts during and about the interaction are not materially in dispute</u>: Deps.

10   Willett and Crocker each applied pressure to plaintiff's wrists.  (UF 38.)  Deps. Willett and

11   Crocker each had a hand on plaintiff's back, with one deputy placing his hand on her lower back,

12   and the other on her upper back and shoulder.  (Dkt. No. 54-2 at 22, 28; Dkt. No. 54-5 at 4-5.)

13   While Deps. Willett and Crocker each grabbed one of plaintiff's wrists, plaintiff fell to her knees,

14   then on to her breasts, and then her face made contact with the floor.  (Dkt. No. 51-4 at 14-15;

15   Dkt. No. 54-2 at 22, 39.)  Plaintiff did not suffer any pain or injuries to her breasts or face.  (Dkt.

16   No. 51-4 at 14-15.) Dep. Brown did not attempt to stop Deps. Willett or Crocker from using a pain

17   compliance technique on plaintiff to get plaintiff to the floor.  (UF 76.)  Because of the incident,

18   Dep. Willett sprained his thumb.  (UF 81.)

19        Plaintiff did not feel any pain from the rear wrist holds applied by Deps. Willett and

20   Crocker until she was on the floor.  (Dkt. No. 60-1 at 5-6.)  At no point during this incident did

21   plaintiff attempt to flee.  (UF 67.)  While the deputies informed plaintiff that they would grab her

22   wrist, they did not warn her specifically that they would inflict pain on her if she continued to

23   refuse to comply with their request to see her wrist.  (UF 75.)

24        The parties agree that a rear-wrist lock control hold does not become a pain compliance

25   technique until pressure is applied in order to inflict pain on the individual that it is being applied

26   on.  (UF 77.)

27        <u>The facts following the interaction are not materially in dispute</u>: Once plaintiff was on the

28   floor, handcuffs were applied almost immediately thereafter by Dep. Brown and plaintiff was

escorted by Deps. Willett, Crocker, and Brown out of YHS to a gurney. (UF 40.) Once on the gurney, plaintiff was placed in soft restraints. (UF 41.)

The records of the paramedics who took plaintiff from YHS to the hospital do not document any immediate injuries from the incident, report that "she states that she does not have a complaint at this time," and report plaintiff as being "calm." (UF 43, 44; *see also* Dkt.No. 13 at 4-5.) Plaintiff did not report any pain in her neck or throat to the doctors at the medical center, the Psychiatric Emergency Services provider, who saw her immediately after the incident. (UF 46.)

Once plaintiff returned from the Section 5150 hold, Austin took photographs of bruises to plaintiff's wrists. (Dkt. No. 54-1 at 18; *see also* Dkt. No. 54-5 at 21.) On August 18, 2017, plaintiff reported pain in her neck or throat to doctors at San Mateo Medical Center.[4] (Dkt. No. 54-10 at 2.)

<u>The facts regarding the policies of San Mateo County are not materially in dispute</u>: On the continuum of force described in the San Mateo County Sheriff's Office ("SMCSO") Use of Force policy, control holds and pain compliance techniques are just above light touch and below higher degrees of force, such as restraint devices and pepper spray. (UF 42; *see also* Dkt. No. 51-14 at 2.) The policy provides that deputies may use reasonable force to effect an arrest," and that pain compliance techniques "may be effective in controlling a physically or actively resisting individual." (*Id.* at 5.) In a different section, the policy manual further advises deputies that deputies "should consider that taking no action or passively monitoring the situation may be the most reasonable response to the mental health crisis." (Dkt. No. 54-6 at 40.)

## II.     LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to

---

[4] Plaintiff states that as a result of Willett's choking of her, she has suffered injuries to her throat, including making it difficult to swallow for more than two weeks after the incident, and leading to visible bruising on the back and sides of her neck. (Dkt. No. 54-5 at 14; Dkt. No. 54-1 at 17.) Plaintiff has also suffered emotional distress as a result of her interaction with defendants. (Dkt. No. 54-5 at 17-18, 19-20.)

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A moving party defendant bears the burden of specifying the basis for the motion and the elements of the causes of action upon which the plaintiff will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the plaintiff to establish the existence of a material fact that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In the summary judgment context, the court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If the plaintiff "produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by" defendants. *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1277 (9th Cir. 2017). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge." *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014) (alteration in original) (quotation omitted). Thus "where evidence is genuinely disputed on a particular issue— such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation marks omitted).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alteration and internal quotation marks omitted). Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each

7

side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (quoting Wright, et al., Federal Practice and Procedure § 2720, at 335–36 (3d ed. 1998)). If, however, the cross-motions are before the court at the same time, the court must consider the evidence proffered by both sets of motions before ruling on either one. *Riverside Two*, 249 F.3d at 1135–36.

## III.    MOTIONS FOR SUMMARY JUDGMENT

### A.    *Monell* Claim and False Imprisonment Based Claims

Plaintiff concedes in her cross-motion that the Court may enter summary judgment on the second cause of action based on a deprivation of constitutional rights in violation of Section 1983, pursuant to *Monell*, and on any claim based on false imprisonment. Accordingly, the Court **GRANTS** summary judgment for defendants on plaintiff's second cause of action, and on plaintiff's remaining causes of action to the extent that they are based on false imprisonment.

### B.    Excessive Force Claim

All parties move for summary judgment on plaintiffs' Fourth Amendment excessive force claim asserting that there are no material fact questions in dispute on the objective reasonableness of the force used here. Having reviewed the entirety of the record, the Court concludes that this is a rare instance where summary judgment is appropriately entered for defendants. Few, if any, material facts are disputed in this matter to require a jury to sift through to reach a conclusion. The Court construes the record in the light most favorable to plaintiff, drawing all inferences in favor of her where applicable.

#### 1.    *Objective Reasonableness of Force*

The Fourth Amendment of the United States Constitution guarantees citizens the right "to be secure in their persons" against "unreasonable seizures." *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985). A Fourth Amendment claim of excessive force requires an examination of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," which "requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396-97 (citations omitted).

First, a court must "assess the quantum of force used to" detain plaintiff "by considering the type and amount of force inflicted." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). Second, "the strength of the government's interest in the force used is evaluated by examining three primary factors: (1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he [or she] is actively resisting arrest or attempting to evade arrest by flight.'" *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (quoting *Graham*, 490 U.S. at 396). Other factors in the calculus include the availability of alternative methods, whether proper warnings were given, and whether the officers knew or should have known that the suspect was emotionally disturbed. *See S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). Of these factors, the Ninth Circuit has held that the most important is "whether the suspect poses an immediate threat to the safety of the officers or others." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994).

While it is true that evidence of a suspect's emotional disturbance or mental illness may also factor into the reasonableness calculus, the Ninth Circuit expressly declined to adopt a "per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals." *Deorle*, 272 F.3d at 1283. *See also Crawford v. City of Bakersfield*, 944 F.3d 1070, 2019 WL 6835319, at *6 (9th Cir. Dec. 16, 2019) ("Although we have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals, our precedent establishes that if officers believe a suspect is mentally ill, they should make a greater effort to take control of the situation through less intrusive means." (internal quotation marks omitted)). Instead, the Ninth Circuit has held that such concerns must be taken into account in assessing reasonableness, and that "the governmental interest in using [deadly] force is diminished" if the suspect has not committed a serious crime but merely shows signs of mental illness or emotional distress. *Deorle*, 272 F.3d at 1283.

"[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . [and] requires careful attention to the facts and circumstances of each particular case[.]" *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9 and *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)). "The calculus of reasonableness must embody

allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "[H]owever, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). "Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue." *Forrester v. City of San Diego*, 25 F.3d 804, 808 (9th Cir. 1994).

The Court considers each of the objective facts referenced above.

a.  Nature and Quality of the Intrusion

The parties do not dispute that the interaction between plaintiff and Deps. Willett, Crocker, and Brown consisted of a rear wrist hold that included pressure applied by Deps. Willett and Crocker and did not include any other weapons or instruments. For purposes of analyzing defendants' motion, the Court assumes that: (1) pressure was applied prior to any active resistance from plaintiff; (2) plaintiff was "choked" by Dep. Willett while being placed on the floor; (3) a knee was placed on her back while she was on the floor; and (4) that she was "thrown" to the floor.

Generally, cases analyzing similar interactions involving control holds or pain compliance techniques have classified the nature and quality of the intrusion to be "minimal[.]" *See Donovan v. Phillips*, No. 3:14-cv-00680-CRB, 2015 WL 993324, at *6 (N.D. Cal. Mar. 4, 2015) (stating that defendant used "minimal force" when using a control hold); *Donovan v. Phillips*, 685 F. App'x 611, 612-13 (9th Cir. 2017) (holding that "nature and quality of the intrusion" were "relatively minimal" where officer placed individual in control hold and individual rolled onto the

ground); *Forrester*, 25 F.3d at 807 (holding that "the nature and quality of the intrusion upon the arrestees' personal security was less significant than most claims of force," where "police did not threaten or use deadly force and did not deliver physical blows or cuts," and the "force consisted only of physical pressure administered on the demonstrators' limbs in increasing degrees, resulting in pain").[5] Further, the quality and nature of the intrusion rises the greater the injuries sustained by the individual. *See*, *e.g.*, *Santos*, 287 F.3d at 854-55 (holding that "a jury could reasonable draw the inference that that the use of force sufficient to break Santos's back was far more intrusive—i.e., far greater—than the [minimal] force used in [a prior case], and was excessive").

Here, the interaction between plaintiff and Deps. Willett, Crocket, and Brown consisted of a rear wrist control hold with pressure applied in order to handcuff plaintiff. Plaintiff did not complain of any immediate pain from the control hold or from allegedly being thrown to the floor by the officers. Documentary evidence from the immediate aftermath explicitly notes that plaintiff had no pain. (*See* Dkt. No. 51-13 at 4 ("PATIENT STATES SHE DOES NOT HAVE A COMPLAINT AT THIS TIME. . . . PATIENT IS NOW CALM AND COOPERATIVE."), 5 ("PT. STATED COMPLAINT: NONE").) Nor did plaintiff complain of any pain to any medical personnel while at hospital during the Section 5150 hold. The only documentary evidence of her physical injuries in the record consists of photographs showing bruises on plaintiff's wrists that were purportedly taken in the days following plaintiff's return to YHS, (*see* Dkt. No. 54-5 at 21) and of a medical report from that same time frame documenting throat pain as a result from a police officer choking her.[6] (Dkt. No. 54-10 at 2.)

---

[5] By contrast, other alternative uses of forces, such as the use of a cloth-cased shot or of a taser, have been held to be intermediate or higher classification. *See*, *e.g.*, *Deorle*, 272 F.3d at 1279-80 (holding that "cloth-cased shot" is "much greater [force] than that applied through the use of pepper spray . . . or a painful compliance hold . . . and more likely to cause a life-threatening injury than most dog bites"); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) ("Here the intrusion on Blondin's Fourth Amendment interests – the discharge of a taser in dart mode upon him – involved an intermediate level of force."). *See also Deorle*, 272 F.3d at 1280 (noting that highest level of force is "deadly force" or "that force which is reasonably likely to cause *death*").

[6] The Court notes that although Austin testified in her deposition that she also took photos of bruises of plaintiff's neck, no such photographs documenting bruises on her neck are in the record. (*See* Dkt. No. 54-1 at 18.)

Moreover, plaintiff introduces no evidence as to any injury as a result from being "thrown" to the floor. Based on plaintiff's own testimony corroborated by Dep. Willett's testimony, after she stood up from the bed and was standing on the floor, plaintiff first contacted the floor on her knees, then hit the floor with her breasts, and finally fell on her face. (Dkt. No. 51-4 at 14-15.) No documentary or medical related evidence was introduced as to any injuries as to her knees, breasts, and face. Further, her testimony confirms that she suffered no pain or injuries as to her breasts or face from allegedly being "thrown" to the floor.[7]

Thus, even assuming the disputed facts noted above in plaintiff's favor, under Ninth Circuit authority, the nature and quality of the intrusions are minimal.[8] The deputies used a control hold which constitutes a minimal amount of force. Further, the evidence reveals a lack of any significant injury. "The extent of any injury to plaintiff, caused by a police officer's use of force, while not a necessary element of an excessive force claim, is nevertheless relevant to show the extent of the force that was used." *Paramo v. City of Morgan Hill*, No. C01-0825MMC (PR), 2002 WL 1497521, at *4 (N.D. Cal. July 9, 2002) (citing *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2001)). Courts may infer from the minor nature of a plaintiff's injuries that the force applied was minimal. *See Jackson*, 268 F.3d at 652. *Cf. Robinson v. Solano County*, 278 F.3d 1007, 1013-15 (9th Cir. 2002) (holding that officer who brandishes gun and "terrorizes a civilian . . . may not cause *physical* injury, but he has certainly laid the building blocks for a section 1983 claim against him (internal citations omitted)); *Santos*, 287 F.3d at 855 ("Although such a form of deductive reasoning may be appropriate in some use-of-force cases, in others the intrusion may be substantial even though the injuries are minor.").

Thus, the Court concludes that the nature and quality of the intrusion is relatively minimal which weighs against plaintiff.

---

[7] The Court notes that plaintiff could not otherwise recall whether she suffered any pain or injuries to her knees. (*See* Dkt. No. 51-4 at 14.)

[8] Moreover, SMCSO's Use of Force policy confirms that the level of intrusion is minimal. SMCSO's policy lists a "Continuum of Force," which begins with "Officer presence," and ends with "Deadly force." (Dkt. No. 51-14 at 2-3.) "Physical control/Pain compliance techniques is just below "Light touch" and just above "Restraint devices." (*Id.*)

b.     Governmental Interests at Stake

The Court now considers the governmental interests by reviewing the *Graham* factors.

First, the most important factor is whether plaintiff presented an immediate threat to another's safety when she was detained. *Chew*, 27 F.3d at 1440. The Ninth Circuit has noted that "[a]lthough *Graham* does not specifically identify as a relevant factor whether the suspect poses a threat to *himself,* we assume that . . . officers could have used some reasonable level of force to try to prevent [an individual] from taking a suicidal act." *Glenn v. Washington Cnty.*, 673 F.3d 864, 874 (9th Cir. 2011) (emphasis original). In other words, the Ninth Circuit "d[id] not rule out that in some circumstances some force might be warranted to prevent suicide," but expressly rejected the "use [of] force capable of causing serious injury or death in an effort to prevent the possibility that an individual might attempt to harm only himself." *Id.*

Here, ample undisputed evidence demonstrates that there was an immediate concern for plaintiff's own safety based on her mental state. Thus: Dep. Willett was aware of plaintiff's mental state through his own observations during their fifteen-minute discussion and through the 911 call information relayed to him, and had further reviewed the journal entry that caused Austin to request a Section 5150 hold. The officers' concern included that plaintiff was suicidal and had cut herself, particularly given plaintiff's repeatedly refusal to comply with officer's instructions and requests to show her arms, and refusal to permit paramedics to perform a medical evaluation beyond taking her blood pressure through a device placed on her finger.[9] Indeed, plaintiff does not challenge and concedes that there was, in fact, a basis for the Section 5150 hold.[10] (Dkt. No. 53 at 9 (non-opposition to false arrest claims).) Thus, the Court concludes that this factor evinces

---

[9] Plaintiff's arguments that Dep. Willett was not informed of plaintiff's mental state through information given on the 911 call is irrelevant where it is undisputed that Dep. Willett read the journal entry that caused Austin to call for a psychiatric hold for plaintiff, (UF 20.) and where he testified that he was indeed relayed information from the 911 call made by Austin. (Dkt. No. 51-5 at 3-4.)

[10] The Court notes and gives the most minimal of weight to Officer's concerns that plaintiff was potentially concealing any weapons, as, aside from the officer's testimony, there is no further evidence that plaintiff was potentially concealing a weapon. *See e.g.*, *Deorle*, 272 F.3d at 1281 ("A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.").

an interest for the government.

Second, the Court considers "the severity of the crime at issue." *Glenn*, 673 F.3d at 872. The Ninth Circuit has held that where an officer is summoned to "help [an] emotionally disturbed" person, not to arrest someone for a crime, the "case [is] not severe by any measure." *Glenn*, 673 at 874. In such circumstances where an officer is summoned to help a mentally ill or emotionally disturbed individual, that person's noncompliance with an officer's orders does not elevate the case to a "severe level". *See id.* at 874 n.9 ("We recognize that the defendants could argue at trial that . . . [the individual] obstructed officers by refusing to follow their orders, and thereby violated the law. . . . We do not diminish the importance of crimes such as those [the individual] might be argued to have committed, but we have previously concluded that similar offenses were not 'severe' within the meaning of the *Graham* analysis."). Instead, "the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community." *Bryan v. MacPherson*, 630 F.3d 805, 829, 832 (9th Cir. 2010) (holding that mental illness or emotionally disturbed state, without more, does not support an intermediate level of force). Here, in light of Ninth Circuit authority, the case is not severe by any measure, and does not indicate a high government interest.[11]

Third, the Court considers whether plaintiff was "actively resisting" or "attempting to evade . . . by flight."[12] *Glenn*, 673 F.3d at 872. Generally, an officer is permitted to use a higher level of force where an individual is *actively* resisting, as opposed to *passively* resisting. *See Headwaters Forest Defense*, 276 F.3d at 1130 (holding that use of pepper spray was unreasonable where protestors were sitting peacefully and did not threaten or harm the officers). "Resistance . . . should not be understood as a binary state, with resistance being either completely passive or active." *Bryan*, 630 F.3d at 830. "Rather, it runs the gamut from the purely passive protestor who

---

[11] The Court thus rejects any potential argument from defendants that plaintiff's refusal to comply with their instructions could transform this matter into a severe case.

[12] No party argues or submits evidence that plaintiff attempted to evade the Section 5150 hold through flight. Accordingly, the Court focuses on whether plaintiff was actively resisting.

simply refuses to stand, to the individual who is physically assaulting the officer." *Id.* at 830. "Even passive resistance may support the use of some degree of governmental force if necessary to attain compliance, however, the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012). "[A] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Id. See also Bryan*, 630 F.3d at 830 (holding that bizarre behavior, such as shouting gibberish and hitting one's quadriceps, does not rise to the level of active resistance). In such passive resistance situations, the use of intermediate levels of force, "including the use of pepper spray . . . and bean bag projectiles . . . were not reasonable." *Nelson*, 685 F.3d at 882.

Here, the parties dispute whether plaintiff was actively resisting when she was placed in a control hold, and when this active resistance started. Except for plaintiff's deposition testimony, Deps. Willett, Crocker, and Austin testified that plaintiff began actively resisting when she rose from the bed by planting her feet and making her body rigid. (*See* Dkt. No. 51-3 at 20 (Austin Depo. ("Q: Prior to going down on the floor did you see M.M. stiffen her body visibly? A: Yes. . . . I just remember her being firm in stating she is not getting on the floor. I remember like her feet being planted and her position very solid.")); Dkt. No. 51-5 at 20-21 (Willett Depo. ("At that point is when she kind of like made her body rigid, know of, you know, resisting[.]")); Dkt. No. 51-6 at 3 (Crocker Depo. ("I remember she tensed her body up.")).) This is logically confirmed and supported by plaintiff's testimony indicating that plaintiff only began feeling pain when she stood up, and not before when she was seated on the bed. (Dkt. 60-1 at 5-6.) However, by the time plaintiff was placed laying down on the floor and that pressure was being applied by Deps. Willett and Crocker no party disputes active resistance.

The Court acknowledges the factual disputes as to the timing and application of the pressure applied to plaintiff and whether evidence of active resistance existed. However, the Court finds that it need not reach that issue to resolve the dispute here. Passive resistance alone can support some level of government force if necessary to attain compliance. *Nelson*, 685 F.3d at 881. Here, plaintiff refused to show the officers her arms and otherwise ignored their instructions.

These facts alone constitute passive resistance. The government thus has an articulated interest, albeit low.

Plaintiff's cited authority does not compel otherwise as all are inapposite.  In none was force found to be excessive where an officer used a minimal level of force on a passively resisting individual.[13]  Instead, in each of the cited cases, the officer used intermediate or higher levels of force on passive participants.  There, the courts routinely found excessive force.

Finally, the Court considers additional factors, including the availability of alternative methods, whether an appropriate warning was given to plaintiff, whether the officers knew that plaintiff was emotionally disturbed, and other interests implicated in Section 5150 holds.  *See S.B.*, 864 F.3d at 1013.  Thus:

First, the Court finds that there were no alternative methods available to defendants.  Here, Dep. Willett attempted to utilize the SMART program to conduct the Section 5150 assessment, but it was unavailable.  Deps. Willett, Crocker and Brown were themselves therefore required to detain plaintiff for her Section 5150 hold.   Given plaintiff's mental state and noncompliance with the officer's instructions and orders for fifteen minutes, some measure of physical force was not unreasonable.  *See e.g., Schramm v. Montage Health*, No. 17-cv-02757-HRL, 2018 WL 1156894, at *6 (N.D. Cal. Mar. 5, 2018) ("A § 5150 detention necessarily involves the use of some force; there is just no way around it.").  Short of fully complying with officer's orders – and it is undisputed that plaintiff was not fully complying with officer's instructions at the time of the applied rear wrist hold – there were no alternatives available to the officers.[14]  Thus, this additional

---

[13]  As discussed at the hearing on December 10, 2019, the only cited case that comes close to plaintiff's situation is *Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003).  Plaintiff's reliance on *Meredith*, an instance outside of the Section 5150 process, does not persuade.  In *Meredith*, the plaintiff during an execution of a search warrant for evidence was, without warning, "grabbed . . . by her arms, forcibly thr[own] to the ground, and, [while an officer was] twisting her arms, [was] handcuffed."  *Id.* at 1061. Such an interaction differs where, as discussed, plaintiff was given fifteen minutes of discussion in an effort to obtain her compliance before being given an explicit warning that she would be and then was subject to a rear wrist hold.  The undisputed evidence here in this matter further suggests that any injuries from being thrown were, at best, minimal.  Moreover, unlike in this matter, in *Meredith* there was a lack of probable cause for plaintiff's detention, the underlying subject matter of the search – alleged tax fraud – did not involve any safety issues, and plaintiff was not a safety threat to anyone, including herself.  *Id.* at 1061.

[14]  The Court notes that while evidence exists that plaintiff offered to voluntarily walk out

factor weighs in favor of the government.

Second, the Court finds that there was an appropriate warning given to plaintiff before the rear wrist hold was applied on plaintiff. Even acknowledging plaintiff's claim that she was not specifically warned about being subjected to pain, (Dkt. No. 53 at 11) she does not dispute that she was warned that failure to comply would result in a countdown and thereafter the officers would grab her wrists and move her to the floor, so that she could be handcuffed. (*See* UF 31, 34; Dkt. No. 51-4 ("It was just a count down, and then I was pulled off my bed. . . . Three, two, one.").) Thus, in light of the record, the Court finds that this additional factor weighs in favor of the government.

Third, the officers who detained plaintiff knew she was emotionally disturbed at the time they detained her. The record is clear that Dep. Willett, who later summoned Deps. Crocker and Brown, were at YHS to conduct an assessment of plaintiff to determine whether to subject her to a Section 5150 hold. In such situations, officers are required to make "a greater effort to take control of the situation through less intrusive means." *Crawford*, 2019 WL 6835319, at *6. As such, this factor weighs against the government in using a higher level of force.

Finally, "[t]he government has an important interest in providing assistance to a person in need of psychiatric care." *Bryan*, 630 F.3d at 829. This is especially so where Deps. Willett, Crocker, and Brown were summoned to YHS primarily to ensure plaintiff received a psychiatric assessment and later care. It is undisputed that an appropriate basis existed for the Section 5150 hold. Given the officers' right to detain plaintiff and that there was a basis for a Section 5150 hold, the "right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Muehler v. Mena*, 544 U.S. 93, 99 (2005) (citation omitted.) "[A] person does not have the right to resist arrest even if the charges are false or the arrest unlawful." *United States v. Willfong*, 274 F.3d 1297, 1301 (9th Cir. 2001). Thus, the Court accords the government an interest in effecting a Section 5150 hold.

---

of the room to the ambulance, (Dkt. No. 51-3 at 18) plaintiff at that point still refused to comply with officer's other instructions, including, significantly, that she show her arms to officers and paramedics to demonstrate that she was not actively self-harming herself.

Accordingly, after consideration of the relevant factors, the Court finds that the government has an interest above minimal in using force in this matter.

### c.    Weighing the Conflicting Interests

Whether defendants' conduct "was objectively reasonable requires [the Court] to consider whether the degree of force used was necessary." *Deorle*, 272 F.3d at 1282 (citing *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)). "[I]n other words, whether the degree of force used was warranted by the governmental interests at stake." *Deorle*, 272 F.3d at 1282 (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

Here, after consideration of the facts in this case, including the entirety of the record in this matter, the Court holds that the government's interest outweigh the nature and quality of the intrusion. As set forth above, the nature and quality of the intrusion was as minimal or as low as it could be in these facts and circumstances. Indeed, this is not a case where intermediate force, such as a taser, was used on a mentally ill or emotionally disturbed individual in order to detain or subdue him. *See Bryan*, 630 F.3d at 829, 832. Simply, short of complying with officers' instructions, there were no alternatives left for the officers to employ in order to detain plaintiff for a Section 5150 hold. "Police officers need not use the least intrusive means available to them." *Luctel v. Hagemann*, 623 F.3d 975, 982 (9th Cir. 2010) (holding that "officers applied the least amount of force necessary to subdue [individual] by pinning her to the ground and handcuffing her" and that "the gravity of the intrusion—low-level use of hands to address [individual]'s drug-induced paranoia—was minimal"); *Forrester*, 25 F.3d at 807-08 ("Police officers, however, are not required to use the least intrusive degree of force possible. Rather, as stated above, the inquiry is whether the force that was used to effect a particular seizure was reasonable viewing the facts from the perspective of a reasonable officer on the scene."). But here, the officers, did, in fact, use the minimal amount of force to detain plaintiff. Such use of force can only be said to be objectively reasonable. *See Forrester*, 25 F.3d at 808 ("[Individuals] ignored pleas to desist and warnings regarding pain compliance techniques, the officers used minimal and controlled force in a manner designed to limit injuries to all involved."). *See also Turner v. City of Santa Rosa*, No. C 96-3865 CRB (ARB), 1998 WL 185336, at *3 (N.D. Cal. Apr. 9, 1998) (no excessive force where

an individual suffered a cut and an alleged wrist injury during a mental episode as a result of being aggressively pulled from a shower by officers in an effort to detain her under Section 5150, individual never complained to anyone at the psychiatric facility of her wrist injury, and she testified at her deposition that the cut was insignificant and that she did not use a band aid for it).

Accordingly, in light of the Court's finding that the officers' use of force was not excessive, the Court **GRANTS** summary judgment on the first cause of action for defendants, and **DENIES** partial summary judgment on the issue of excessive force for plaintiff. In light of the foregoing analysis, the Court **DENIES AS MOOT** defendants' request for summary judgment on the issue of qualified immunity.

### C.     State Law Claims

Defendants move for summary judgment on plaintiff's state law claims, the third and fourth causes of actions in her complaint. Defendants argue that both causes of action fail because defendants did not use excessive force.

#### 1.     Bane Act

Section 52.1 of the California Civil Code, also known as the Bane Act, creates a right of action against any person who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or . . . of this state." Cal. Civ. Code § 52.1(a). A Bane Act claim requires a showing of "specific intent" on the part of the officer to violate the constitutional right at issue. *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018) ("[T]he specific intent requirement . . . is consistent with the language of Section 52.1, which requires interference with rights by 'threat, intimidation or coercion,' words which connote an element of intent."); *B.B. v. Cty. of Los Angeles*, 25 Cal. App. 5th 115, 133 (Ct. App. 2018) ("Like . . . *Reese*, we conclude that, to establish liability under the Bane Act, a plaintiff must prove the defendant acted with a specific intent to violate the plaintiff's civil rights."). "The act of interference with a constitutional right must itself be deliberate or spiteful." *Julian v. Mission Community Hospital*, 11 Cal.App.5th 360, 395 (2017) (citation omitted).

Here, based on the Court's prior analysis holding that plaintiff did not suffer a deprivation

19

of a constitutional right under the Fourth Amendment, plaintiff's claim under the Bane Act –

requiring a violation of a civil or constitutional right – cannot be maintained. Accordingly, the

Court **GRANTS** summary judgment for defendants on plaintiff's third cause of action under the

Bane Act.

### 2. Battery

Claims for battery arising out of the alleged use of unreasonable force by a police officer

are analyzed under the same objective reasonableness standard as under the Fourth Amendment.

*Hernandez v. City of Pomona*, 46 Cal. 4th 501, 514, 94 Cal.Rptr.3d 1, 207 P.3d 506 (2009)

("California's civil jury instructions specifically direct the jury, in determining whether police

officers used unreasonable force for purposes of tort liability, to consider the same factors that the

high court has identified [for a section 1983 action]"); *Lopez v. City of Los Angeles*, 196

Cal.App.4th 675, 685, 126 Cal.Rptr.3d 706 (2011); *Hernandez v. City of Pomona*, 46 Cal.4th 501,

513-515, 94 Cal.Rptr.3d 1, 207 P.3d 506 (2009); *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269,

1273, 74 Cal.Rptr.2d 614 (1998) (battery by police officer requires showing unreasonable force

was used). Thus, the Court analyzes plaintiff's claim for battery under the same rubric as under

the Fourth Amendment.

Here, in light of the Court's prior Fourth Amendment analysis concluding that Deps.

Willett, Crocker, and Brown's actions were objectively reasonable and that they did not use

excessive force, plaintiff's claim for battery must similarly be rejected. Accordingly, the Court

**GRANTS** summary judgment for defendants on plaintiff's fourth cause of action of battery.

## IV. MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY OF ROGER CLARK UNDER FED. R. EVID. 702

Because the Court has ruled that summary judgment is appropriately entered as to

defendants, the Court **DENIES AS MOOT** defendants' motion to exclude expert opinions and

testimony of Roger Clark under Fed. R. Evid. 702.

## V. CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows: (1) the Court **GRANTS**

defendants' motion for summary judgment; (2) the Court **DENIES** plaintiff's motion for partial

summary judgment; and (3) the Court **DENIES AS MOOT** defendants' motion to exclude expert

opinions and testimony of Roger Clark under Fed. R. Evid. 702.

This Order terminates Docket Numbers 51, 53, and 59.

**IT IS SO ORDERED.**

Dated: January 9, 2020

_____
YVONNE GONZALEZ ROGERS
United States District Judge